IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Christopher Silva,<br><br>                    Plaintiff,<br><br>      vs.<br><br>Voya Services Company Employee Welfare Benefits Plan,<br><br>                  Defendant. | C.A. No.: 6:19-cv-00318-DCC<br><br><br>OPINION AND ORDER |

This is an action seeking health insurance benefits under a group welfare benefit plan that is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* This matter is before the Court on the Parties' Joint Stipulation, and cross-Memoranda in Support of Judgment, ECF Nos. 20, 27, and is based on an administrative record, ECF No. Nos. 22–26. For the reasons set forth below, the Court grants judgment in favor of Defendant.

## I. FINDINGS OF FACT

Plaintiff Christopher Silva ("Silva") was a beneficiary of Defendant Voya Services Company Employee Welfare Benefits Plan (the "Plan") based upon his father's participation in the Plan as an employee of Voya Financial Services. From January 8, 2015 through May 15, 2016, Silva received inpatient mental health treatment at CooperRiis, a residential treatment facility in Asheville, North Carolina.[1] The Plan approved coverage for inpatient treatment for the period January 8, 2015 through March

---

[1] Silva's stay at the residential treatment facility continued after May 15, 2016; however, his coverage under the Plan ended on May 15, 2016.

18, 2015, but denied further benefits after determining Silva's condition did not meet the standard for inpatient or residential care.

A.    Silva's Medical Treatment at CooperRiis

Silva arrived at CooperRiis on January 7, 2015.  According to CooperRiis' intake records, Silva had a history of depression and anxiety with episodes of paranoia and delusional thoughts.  ECF No. 22 at 82.  Silva had previously received outpatient treatment for his conditions from 2010 through 2013, with one period of inpatient hospitalization for mania in 2013.  From January 2014 until his arrival at CooperRiis, Silva lived with his parents and received outpatient treatment.  A January 8, 2015 Psychiatric Initial Assessment stated it was "his mother's idea for him to come to cooper riis to continue stabilization. It seems they have felt it a 'burden' to have [him] at home."  *Id.* at 90.  Silva stayed at CooperRiis more than 18 months; however, records show that he received no intensive mental health treatment during any of that time.

Silva saw Dr. Jennifer Pasternack, a psychiatrist, on an approximately bi-monthly basis during his first seven months at CooperRiis.  On January 23, 2015, two weeks after Silva arrived at CooperRiis, Dr. Pasternack met with him and noted the following:

> Depression and anxiety not bad, no [suicidal ideation]. Used to be paranoid about govt conspiracies and be upset by planes overhead, but this is resolved. Sleeping 10 to 12 hr/night and still struggling with fatigue. Finds CR structure helpful with this as is getting up a bit earlier in the morning . . . .  Affect reactive, minimal psychomotor retardation, speech coherent, no delusions voiced.

ECF No. 23 at 43.  Thus, two weeks after being admitted to CooperRiis, Silva was not complaining of or exhibiting any significant symptoms.  Silva also managed his medications independently from the beginning of his stay at CooperRiis.

On February 3, 2015, Dr. Chris Mulchay, a psychologist, met with Silva. Dr. Mulchay noted Silva would receive the lowest level of care (Level I) offered by CooperRiis. *Id.* at 14. Dr. Mulchay established a treatment plan that included therapy to help Silva have better restorative sleep, frequent check-ins and encouragement from the staff to participate in activities, and group therapy. Silva saw Dr. Pasternack again on February 18, 2015. Silva stated "he would like to continue his recovery here through the community program and possibly stay in this area permanently." *Id.* at 42. On March 11, 2015, Silva told Dr. Pasternack he was having trouble getting out of bed because he was staying up late to watch television. *Id.* At this time, Silva was two months into his stay at CooperRiis, and had not exhibited any noted acute symptoms.

Silva continued to see Dr. Pasternack on an approximately bi-monthly basis through May 29, 2015. At each of those consultations, Silva was stable and had no acute symptoms. Dr. Pasternack did not record any significant concerns about Silva having paranoia or delusions.

On June 10, 2015, Silva informed Dr. Pasternack that he hoped to transition in August 2015 to his own apartment in South Asheville. *Id.* at 36. Dr. Pasternack did not record any concerns about Silva doing so. During a July 3, 2015 consultation, Silva reported having depression and anxiety as a result of taking a new medication. *Id.* Silva was allowed to adjust the medication dosage on his own and was trying to decide if he could tolerate the new dosage. Otherwise, Silva was stable and had no complaints.[2]

---

[2] On July 2, 2015, Dr. Mulchay signed off on a 90 Day Diagnosis and GAF Review, which listed an "Overall Rating" of "Severe" for Silva. However, none of Silva's CooperRiis medical records up to or after that date provide any explanation for why Silva's condition would be rated "severe." ECF No. 22 at 99.

Silva saw Dr. Pasternack three more times between July 3, 2015 and August 12, 2015. Silva was stable and doing well during each of those visits. During the August 12, 2015 consultation, Dr. Pasternack reported Silva had transitioned to a community program, where he would be living with roommates in an apartment setting. This was Dr. Pasternack's final consultation with Silva and she made the following notes:

> [Silva] feels he is doing really well. He is working on setting up some volunteer work, but hopes to find a paid position he likes eventually. No voices, still sometimes has a feeling like concrete in his head. Still endorses some "paranoia" e.g. gets anxious and uncomfortable when he hears a helicopter. Mood is good, anxiety not too bad. Still getting up at a reasonable hour every morning with adequate energy . . . affect reactive, speech coherent, a bit concrete, no delusions, forward looking, no [suicidal ideation/homicidal ideation].

ECF No. 23 at 33.

After August 12, 2015, Silva saw Dr. John Nicholls, another psychiatrist, on a monthly basis. On August 24, 2015, Dr. Nicholls noted Silva had one prior reported suicide attempt many years earlier when Silva allegedly crashed his car. Silva was noted as being stable. *Id.* On September 7, 2015, Dr. Nicholls recorded that Silva was "[v]ery stable." *Id.* at 32. Silva also informed Dr. Nicholls that he had begun working as an Uber driver about a week earlier.

On October 5, 2015, Silva was again "very stable" and continued to work for Uber. *Id.* at 30. On November 2, 2015, Silva reported he was continuing to work as an Uber driver and that "my paranoia is very low" and "I'm thinking better now." *Id.* at 29. At this point Silva had been at CooperRiis almost 10 months and there were no reports of any acute or significant symptoms.

Silva continued to see Dr. Nicholls on a monthly basis until at least February 8, 2016. During those monthly consultations, Silva's condition remained stable with little, if any, reports of delusions, paranoia, or psychosis.

B.     Counseling at CooperRiis

Silva also met with a CooperRiis counselor on an approximately weekly basis. Silva's first counseling session took place on January 12, 2015, four days after he arrived at CooperRiis. *Id.* at 70. The counselor's notes did not note any significant problems or symptoms.

On April 28, 2015, Silva and his counselor worked on his core goals and dream statement. *Id.* at 67. Silva "seem[ed] to like the goal setting process and is engaged when we work on his goals. We added a core goal having to do with him getting a job in the future. He kept his other goal of having more energy."

On August 18, 2015, Silva's counselor noted that a car was being delivered to Silva for his personal use, and that Silva was planning to work as an Uber driver once the car arrived. *Id.* at 62. On September 19, 2015, Silva reported to his counselor that "he thoroughly enjoys working through Uber and hanging out with other community members."

On October 7, 2015, the counselor reported the following:

[Silva] has continued to spend the majority of his evening hours out 'Ubering,' but does return to spend time with his housemates to watch sports, and go for ice cream. He noted feeling pleased with his psychiatrist, and that he felt that taking things slowly in terms of his recovery is good for him. He is challenged with some aspects of cleanliness, with dishes being the main concern. He seems willing to take part in clean up when prompted, but has also not self-initiated the other parts of his house contributions.

*Id*. at 60.

The October 7 counseling note highlights the fact that the primary benefit to Silva of being at CooperRiis was to help him with daily living skills.  Silva's records do not demonstrate that Silva needed assistance with his medications or obtaining and keeping a job.

Silva's counseling notes from October 2015 through June 4, 2016 reflect that Silva enjoyed shopping for and cooking food for his roommates on his "cook night," that he continued to work for Uber, and that he continued to socialize and go out with his friends.

C.     Dr. Pasternack Statement

During the claims review process discussed below, Silva, through his attorney, submitted an undated and unsworn "Statement of Dr. Jennifer Pasternack."  ECF No. 24 at 3.  Dr. Pasternack's Statement does not appear to have been prepared during the time in 2015 when Dr. Pasternack was treating Silva, because it was not provided to the Plan when the Plan's third-party claims administrator requested medical records from CooperRiis.  The Statement was submitted by Silva's attorney more than three years later.

Dr. Pasternack's Statement is not supported by Silva's medical records from CooperRiis. Specifically, Dr. Pasternack's Statement states that Silva's "conditions affected him to the point that it was necessary to seek residential care."  Contrary to this statement, Silva's CooperRiis intake records state that Silva was sent to CooperRiis after being told by his mother that "this would be a good time for [him] to seek treatment after years of outpatient support." ECF No. 22 at 82.  Further, the administrative record demonstrates that one of the primary reasons for Silva being admitted for residential

6

treatment was his parents' desire to be relieved of the "burden" of having Silva at home. *Id*. at 90.

Dr. Pasternack's Statement also states, "[i]t was decided that treatment for his conditions could only be effective in an intensive, highly structured therapeutic setting." However, neither the medical records in the administrative record nor Dr. Pasternack's Statement identify what condition required intensive, highly structured therapeutic treatment; why any condition required intensive, structured therapeutic setting; or who made the medical determination that such treatment was necessary.

D.    <u>Applicable Plan Provision and Level of Care Guidelines</u>

The Plan's Mental Health Services provision provides in relevant part as follows:

Mental Health Services include those received on an inpatient or outpatient basis in a Hospital and an Alternate facility or in a provider's office.

Benefits include the following services . . .

•     Partial Hospitalization/Day Treatment
•     Services at a Residential Treatment Facility; and
•     Intensive Outpatient Treatment.

The Mental Health/Substance Use Disorder Administrator determines coverage for all levels of care . . .

With respect to Silva's claims, the Plan and its third-party claims administrator for mental health claims, United Behavioral Health ("UBH"), applied the Optum 2015 Level of Care Guidelines for Residential Treatment Center Mental Health Conditions (the "LOC Guidelines"). The LOC Guidelines are based on the American Association of Community Psychiatrists (2010) Level of Care Utilization System for Psychiatric and Addiction

Services, Adult Version. The following LOC Guidelines[3] for All Levels of Care are applicable to the dispute between the parties regarding Silva's claims:

**1.    Admission Criteria**

1.4    The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission).

1.7.4    Services are clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks.

1.9    Treatment is not primarily for the purpose of providing social, custodial, recreational, or respite care.

**2.    Continued Service Criteria**

2.1    The admission criteria continue to be met and active treatment is being provided. For treatment to be considered "active" services must be:

2.1.1    Supervised and evaluated by the admitting provider;
2.1.2    Provided under an individualized treatment plan that is focused on addressing the "why now" factors, and makes use of clinical best practices;
2.1.3    Reasonably expected to improve the member's presenting problems within a reasonable period of time.

**3.    Discharge Criteria**

3.1    The continued stay criteria are no longer met. Examples include:

3.1.1    The "why now" factors which led to admission have been addressed to the extent that the member can be safely transitioned to a less intensive level of care, or no longer requires care.

---

[3] A complete copy of the LOC Guidelines for Admission and Continued Service Criteria is included in the administrative record.

In addition, the following LOC Guidelines for Residential Levels of Care are applicable:

**1.    Admission Criteria**

1.3    The "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include:

>    1.3.1    Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.

>    1.3.2    Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

**2.    Continued Service Criteria**

2.2    Treatment is not primarily for the purpose of providing custodial care. Services are custodial in nature when they are any of the following:

>    2.2.1    Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring and ambulating).

E.    Denial of Silva's Claims

**1.    Initial Claims Denial**

UBH approved Silva's claims for residential treatment from January 8, 2015 through March 18, 2015. On February 20, 2015, a UBH claims analyst consulted with Dr. Pasternack regarding Silva's level of care. That consultation included the following information:

>    Appears this is more psychosocial rehab and long term residential, will need to check benefit, appears he is nearing a point where we may not be able to auth this as residential [mental health], discussed with provider.

UBH consulted with Dr. Pasternack's office again on March 23, 2015. The UBH claims analyst noted the following:

> The member is not being seen by the attending weekly which is the standard for this [level of care]. He is not receiving intense nurse monitoring nor aggressive medication interventions. It appears his remaining symptoms can be monitored at a [lower level of care] with community supports. He does have recovery coaches. Care could continue in the MENTAL HEALTH OUTPATIENT setting with community supports and/or a group home.

On March 23, 2015, UBH denied further residential treatment services for Silva after March 18, 2015. A year later, in March 2016, Silva appealed the denial of his claim. UBH's Associate Medical Director, Dr. Michael Soto, conducted a review of Silva's records and determined that his claim for benefits after March 18, 2015 had been properly denied. UBH informed Silva that the denial of his claims had been upheld by letter dated April 28, 2016.

## 2.    Silva's Lawsuit against UBH and Bifurcation of Claims

After UBH's initial denial of Silva's claim for benefits, Silva filed a lawsuit against UBH. Although the Plan was not a party to the lawsuit, as part of the resolution of Silva's lawsuit against UBH, the Plan agreed to undertake further review of the denial of Silva's claims for the period March 19, 2015 to May 16, 2016 as follows:

- For the period March 19, 2015 through July 31, 2015, the Plan would conduct a final administrative review of Silva's denied claims. This period is referred to herein as **Period 1**.

- For the period August 1, 2015 through May 15, 2016, UBH would conduct a first level appeal of Silva's denied claims. This period is referred to as **Period 2**.

- In the event that UBH upheld the denial of Silva's claims for Period 2, the Plan would conduct a final administrative review of the Period 2 claims.

## 3.    Final Denial of Period 1 Claims

In conjunction with the final review of Silva's claims for Period 1, the Plan requested an independent medical opinion from Dr. Alan Schneider, a board-certified psychiatrist. After reviewing all of Silva's medical records, information submitted by Silva's attorney, and the LOC Guidelines, Dr. Schneider provided the following opinion and answers to questions:

> The 2015 Optum Level of Care Guidelines are attached. Does the member meet the level of care guidelines for residential treatment from 3/19/2015-7/31/2015? And if not, what level of care would have been appropriate?
>
> **No, he did not. The patient could have safely and effectively been treated at a lower level of care for dates of service 3/19/15 to 7/31/15. Outpatient level of care would have been appropriate.**
>
> Should the levels of care provided be considered the standard of care for the member's clinical scenario?
>
> **No. The level of care this patient received was far in excess of what is considered "standard care."**
>
> **Rationale/Source of Determination**
>
> This patient did not meet the common admission criteria [1-3]. His condition at the time of admission could have been safely, efficiently, and effectively assessed and treated in a less intensive level of care. His care at the residential and PHP levels of care did not meet the generally accepted standard of care. Examination of records demonstrate that a substantial portion of his treatment was in fact devoted to healthy living skills that did not require any level of engagement above outpatient care. He had no significant medical needs. He was compliant with medications and treatment.

ECF No. 27 at 15.

After receiving Dr. Schneider's report, the Plan upheld the denial of Silva's claims for Period 1. The Plan informed Silva's attorney of its decision by letter dated November 2, 2018.

### 4.     Final Denial of Period 2 Claims

UBH conducted the first level appeal review of Silva's claims for Period 2. As part of that review, Dr. Sherifa Iqbal, a board certified psychiatrist, reviewed Silva's medical records and the LOC Guidelines. Dr. Iqbal made the following notes about Silva's medical records from Period 2:

> The 8/24/2015 physician note sates (sic) that the member was "very stable." He denied [suicidal ideation] or [homicidal ideation]. He interacted well with the provider, giving a thorough symptom and medication history. He was calm and cooperative. He was managing his ADLs as noted by his normal appearance in the mental status exam. He was noted to have "mild paranoia at baseline." He was not having hallucinations. His thought process was linear and logical with fair insight and judgment. He was scheduled to see the provider again in two weeks.
>
> In summary, it appears that during the appealed dates, the member was calm and cooperative. He was managing his activities of daily living without apparent issue. He was denying SI, HI. His paranoia was at baseline. He was not grossly psychotic. It does not appear that he had any mental health symptoms that would have necessitated 24 hour monitoring in the residential setting to be safely treated.

*Id.* at 27.

On December 12, 2018, UBH, in a letter authored by Dr. Iqbal, notified Silva that the first level appeal review of the decision to deny his Period 2 claims had resulted in the denial being upheld. The Plan then moved forward with the final review of Silva's Period 2 claims.

The Plan requested an independent medical opinion from Dr. Schneider with respect to Silva's Period 2 claims. After reviewing all of Silva's medical records, information submitted by Silva's attorney, and the LOC Guidelines, Dr. Schneider provided the following responses to questions from the Plan:

1.  Does the member meet the level of care guidelines for continued residential treatment from 8/1/15 through 5/15/16? If not, what level of care would have been appropriate?

The dates in question do not meet medical necessity for residential level of care. According to plan policy, during this time the patient's condition was stabilized to the point where he could have safely and effectively been treated in an outpatient level of care . . . . .

2.      Should the member's residential treatment through 5/15/2016 be considered the standard of care for his clinical picture?

This was not the standard of care. By current standards, such as MCG or InterQual during this nine-month interval, the patient did not in fact meet any criteria that warranted residential level of care.

3.      Did anything change in the treatment level or treatment plan making residential treatment the appropriate level of care from 8/1/16 to 5/15/16?

No. In fact, analysis of the records shows that for the time in question the patient had achieved a level of stability that was far in excess of the previous records reviewed. The use of this modality was totally inconsistent with his clinical presentation.

4.      Did anything change in the patient's status to warrant residential treatment?

No. If anything, improvement in the patient's condition warranted a step down in his care to prevent institutional regression. In essence, keeping him at a higher level of care worked counter to his meds.

Dr. Schneider then provided the following conclusion:

Clearly, his functionality was quite intact and the above topics[4] (which were the focus of the treatment) were social in nature, and did not constitute residential care for the dates 8/1/15 through 5/15/16. All of the above, in aggregate, do not show any change in the progression of treatment which would warrant continuing care in this individual above the level of outpatient psychotherapy with periodic medication management.

*Id* at 27.

---

[4] The referenced topics were (1) discussions of Silva's interest in President Trump; (2) meetings with his PMD/dentist/father; (3) pleasant thoughts about his eating habits and his roommates; (4) a multitude of discussions about rowing career; and (5) discussion of his time at the gym.

After receiving Dr. Schneider's report, the Plan upheld the denial of Silva's claims for Period 2. The Plan informed Silva's attorney of its decision by letter dated January 11, 2019.

## II. PROCEDURAL HISTORY

On February 4, 2019, Silva filed a Complaint in this Court. Silva's Complaint alleged a single cause of action under 29 U.S.C. § 1132(a)(1)(B) to recover health insurance benefits. The Plan timely answered Silva's Complaint and denied that Silva is entitled to any relief in this matter.

On November 8, 2019, the Parties filed a Joint Stipulation regarding the administrative record, Plan document, standard of review, and other matters. ECF No. 21. The Parties also filed an evidentiary appendix to the Joint Stipulation, which included the administrative record and Plan document. ECF Nos. 22–26. The Parties stipulated that the Court may dispose of this case based on cross-memoranda for judgment. The Parties further stipulated that the issue before the Court "is whether [the Plan] abused its discretion under the Plan in denying [Silva's] claim for health insurance benefits."

On November 8, 2019, the parties filed their cross-Memorandum in Support of Judgment. ECF Nos. 20, 27. The Plan filed a Reply to Plaintiff's Memorandum in Support of Judgment on November 15, 2019.

## III. CONCLUSIONS OF LAW

A.    <u>Standard of Review</u>

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed under an abuse of discretion standard of review when, as here, the Plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the

terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In this case, the parties have stipulated that the standard of review is abuse of discretion. ECF No. 21, ¶ 3.

The abuse of discretion standard is "highly deferential" to the plan administrator. *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 168 (4th Cir. 2013). When applying this standard, "[t]he court must not disturb the administrator's decision if it is reasonable, even if the court itself would have reached a different conclusion." *Haley v. Paul Revere Life Ins.*, 77 F.3d 84, 89 (4th Cir. 1996). When assessing the reasonableness of the administrator's decision, the reviewing court may consider non-exclusive factors, including the following:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4thCir. 2008) (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000)).[5]

A plan administrator's decision is reasonable as long as the denial of benefits results from "a deliberate, principled reasoning process" and "is supported by substantial evidence." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) (internal citation omitted). Substantial evidence, which "consists of more than a mere scintilla of

---

[5] The parties have only made arguments relating to the first, third, fifth, and seventh factors. Analysis of those factors is contained within the Court's discussion below.

evidence but may be somewhat less than a preponderance," is evidence that "a reasoning mind would accept as sufficient to support a particular conclusion." *Whitley v. Hartford Life & Accident Ins. Co.*, 262 F. App'x 546, 551 (4th Cir. 2008) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks omitted).

In the present case, the Plan expressly gives the Plan Administrator, Voya Financial Services (the "Company"), and UBH discretionary authority as follows:

> The Company and the Claims Administrator (UBH) have the sole and exclusive discretion to:
>
> • interpret Benefits under the Plan
>
> • interpret the other terms, conditions, limitations and exclusions of the Plan, including the SPD and any Riders and/or Amendments; and
>
> • make factual determinations related to the Plan and its Benefits.
>
> The Company and the Claims Administrator may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Plan.

ECF No. 26 at 7.

Based on the controlling and applicable case law, and the express language of the Plan, the applicable standard of review in this case is the abuse of discretion standard.

      B.    <u>The Plan's Decisions to Deny Silva's Claims after March 18, 2015 Were Not an Abuse of Discretion</u>

          1.    <u>The Plan's Decisions to Deny Silva's Claims Were the Result of a Deliberate, Principled Reasoning Process</u>

The Plan properly denied Silva's claims for benefits after March 18, 2015. UBH obtained all of Silva's relevant medical records and also allowed Silva and his attorney to submit any additional information they wished to submit. Qualified board-certified psychiatrists (Dr. Soto, Dr. Iqbal, and Dr. Schneider) conducted reviews of Silva's records,

including all of the information Plaintiff and his attorney submitted during the administrative review process, and unanimously opined that Silva's condition did not require inpatient or residential treatment.  UBH and the Plan conducted thorough reviews of Silva's claims and made determinations that were based upon and supported by the overwhelming evidence in Silva's medical records.  The Plan and UBH satisfied all of the requirements of ERISA and the Plan throughout the claims review process.  The Plan and UBH's decision-making process was methodical, deliberate, principled, and well-reasoned. Neither the Plan nor UBH abused their discretion.

**2.      The Plan's Decisions to Deny Silva's Claims Were Supported by Substantial Evidence**

The evidence in the medical record demonstrates that Silva was not suffering from any acute or significant mental health symptoms at the time he arrived at CooperRiis or at any time from January 8, 2015 through May 15, 2016.  By the admission of Silva's mother, Silva was sent to CooperRiis by his parents because it was a "burden" to have him at home. The evidence also demonstrates that Silva had been receiving outpatient treatment for a lengthy period of time prior to arriving at CooperRiis, and nothing about his mental health changed significantly at the time he went from that outpatient treatment to inpatient treatment at CooperRiis.

The records from the attending physicians at CooperRiis, Dr. Pasternack and Dr. Nicholls, do not document any current significant mental health concerns at any time during Silva's stay at CooperRiis.  Rather, both physicians discussed a history of mental

health issues dating back to Silva's teenage years, but repeatedly and consistently documented Silva as being "stable" or "very stable" during his time at CooperRiis.[6]

The records of Silva's CooperRiis counselors demonstrate that Silva was not receiving intensive mental health treatment for acute mental health problems at CooperRiis. Silva lived independently, drove for Uber, socialized with his friends, and watched television, while receiving occasional therapy, group support, and reassurance.

In addition to this substantial evidence from Silva's own medical and counseling records, the independent medical opinions of Dr. Schneider strongly support the decisions to deny Silva's claims. Based on two thorough reviews of all of the available information, Dr. Schneider opined as follows:

- Outpatient level of care would have been appropriate [after March 18, 2015].

- The level of care this patient has received was far in excess of what is considered "standard care."

- Examination of records demonstrate that a substantial portion of his treatment was in fact devoted to healthy living skills that did not require any level of engagement above outpatient care.

- [I]mprovement in the patient's condition warranted a step down in his care to prevent institutional regression.

ECF No. 24 at 90.

Dr. Schneider's statements were supported by Silva's medical and counseling records.

_____

[6] In Dr. Pasternack's Statement, she states that she "believe[d] it was medically necessary for [Silva] to receive residential care and subsequent day treatment from January 8, 2015 to May 15, 2016 at Cooperriis." However, Dr. Pasternack's statement is not supported by her own contemporaneous medical records or the other records from CooperRiis.

Finally, while Dr. Pasternack's Statement does not agree with Dr. Schneider's opinions, that disagreement does not impact the conclusion that the Plan's decision was reasonable and supported by substantial evidence.[7]  Dr. Pasternack's Statement is not supported by the evidence, and Dr. Pasternack offered no rationale or reason for her statement that Silva could only be treated effectively in a highly structured therapeutic setting.  The contemporaneous medical records and counseling notes demonstrate conclusively that Silva did not receive highly structured care.  As stated above, Silva lived independently, drove for Uber, socialized with his friends, and watched television, while receiving occasional therapy, group support, and reassurance.  When considered in conjunction with Dr. Pasternack's Statement, the Plan's basis for denying Silva's claims provides substantial evidence to support the Plan's decisions.

### 3.    Statements Submitted by Silva Are Not Supported by His Medical Records

In support of his argument that the Plan abused its discretion, Silva relies on prepared letters and statements rather than the medical records of his health care providers.  Silva relies primarily on two letters from Nurse Practitioner Horn, who did not begin treating Silva until December 2016; a letter from Dr. Mulchay; and Dr. Pasternack's

---

[7] Moreover, to the extent that any support could be found in the medical record for Dr. Pasternack's conclusory statements, "ERISA does not impose a treating physician rule under which a plan must credit the conclusions of those who examined or treated a patient over the conclusions of those who did not." *White v. Sun Life Assurance Co. of Canada*, 488 F.3d 240, 254 (4th Cir. 2007).  Rather, ERISA requires that "an insurer must present a basis 'a reasoning mind would accept as sufficient' to support its decision." *Id.* (quoting "*LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 2018 (4th Cir. 1984)).  Here, the Plan relied on contemporaneous medical records from Silva's treating physicians, counseling notes from professional mental health counselors, and the well-reasoned opinions of Dr. Schneider, which support the Plan's decisions.

Statement. Silva has failed to identify any contemporaneous medical records that support his claim for benefits after March 18, 2015; however, Silva's contemporaneous medical records are the best evidence of his condition and treatment during the relevant time. As such, the Plan did not abuse its discretion by relying on Silva's medical records and in turn rejecting conclusory statements that are not supported by those same medical records.

### 4.     The Plan Did Not "Cherry Pick" the Medical Evidence

Silva argues that the Plan abused its discretion by relying on reviewing physicians who "cherry picked" evidence from his medical records, while ignoring other evidence that allegedly supported his claims.     However, the medical record contained in the administrative record demonstrates that the Plan and the reviewing physicians considered all of Silva's medical records and counseling notes. Cherry picking the medical record was not necessary because Silva's records consistently and repeatedly demonstrate that he was stable and not experiencing any acute symptoms throughout his time at CooperRiis.

### 5.     The Plan Properly Considered the Impact of Silva's Treatment at CooperRiis on His Mental Health Condition

Silva cites *Wiwel v. IBM Medical and Dental Benefit Plan for Regular Full-time and Part-time Employees*, 2018 WL 526988 (E.D.N.C. 2018), in support of an argument that the Plan abused its discretion by failing to consider that Silva's condition improved "simply by virtue of his being treated" at CooperRiis.  Because *Wiwel* is distinguishable from the present case on its facts, it is not applicable.

In *Wiwel*, a mental health necessity of care case, the court held that the defendant abused its discretion when it determined the plaintiff no longer needed residential care

after she improved with treatment.  In reaching its decision, the court pointed out two important facts that are not present in Silva's case:

1.    [T]he IPRO report[8] did not address E.W.'s self-report that the reason she refrained from self-cutting after March 10, 2014, was that she did not want to suffer consequences imposed at La Europa.[9] *Id.* at *4.

2.    [I]n finding that E.W. safely could have left La Europa March 10, 2014, the IPRO reviewer offered no reasons to conclude that removing E.W. from the care of La Europa would not return E.W.'s progress to its prior dynamic of decline. *Id.* at *5.

In the present case, there is no evidence (1) that Silva had acute or significant symptoms related to his mental health condition when he arrived at CooperRiis or at any time during his stay at CooperRiis; (2) that Silva's symptoms progressed in a negative manner at any time during his stay at CooperRiis; (3) that Silva modified his behavior due to concern about negative consequences imposed at CooperRiis; or (4) that Silva's condition or symptoms were in a "dynamic of decline" at the time he arrived at CooperRiis. For all of these reasons, *Wiwel* is distinguishable from the present case.

### 6.    The Plan Adequately Addressed Silva's Symptoms and Underlying Psychiatric Conditions

Silva, with no citation to medical records in the administrative record, argues that he experienced severe symptoms related to his psychiatric conditions during his stay at CooperRiis.  However, the administrative record does not support this assertion. Although Silva has been diagnosed with depression and anxiety with symptoms of delusion, paranoia, cloudy thinking, and obsessive thoughts, none of those symptoms manifested themselves in an acute manner while Silva was at CooperRiis.

---

[8] A reviewing physician's report.

[9] La Europa is a mental health residential care facility.

Silva cites to *Wit v. United Behavioral Health*, 2019 WL 1033730 (N.D. Cal. 2019), in which the court ruled that the defendant failed to adequately consider the plaintiffs' underlying medical conditions and also did not adequately consider whether individual plaintiffs in the case could be safely and effectively moved to a lower level of care. Silva argues that the Plan is required to demonstrate that outpatient care for Silva would have been just as effective as the treatment he received at CooperRiis. As an initial matter, ERISA does not impose such a requirement on the Plan. Rather, as set forth above, ERISA requires a plan administrator to properly apply plan terms, provide a decision-making process that is reasoned and principled, and render decisions that are consistent with the purposes and goals of the subject plan. In the present case, the purposes and goals of the Plan are to provide mental health benefits when such benefits are needed due to the severity of a claimant's mental health condition. The purposes and goals of the Plan are not to allow a claimant to choose a higher level of care simply because the needed lower level of care is subsumed in the higher level of care and the claimant desires the higher level of care.

Even if the Court were to accept Silva's proposed rule, the Plan has met any obligation to demonstrate that an outpatient level of care would have been just as effective in treating Silva's conditions as the treatment he received at CooperRiis. The Plan specifically addressed whether Silva could be safely and effectively transferred to a lower level of care. Addressing Silva's condition, Dr. Schneider opined as follows:

> There was no issue of the patient's medical or psychiatric safety during these months . . .
>
> Analysis of the records show that for the time in question the patient had achieved a level of stability that was far in excess of the previous records

22

reviewed. The use of this modality was totally inconsistent with his clinical
presentation . . .

If anything, improvement in the patient's condition warranted a step down
in his care to prevent institutional regression. In essence, keeping him a
higher level of care worked counter to his needs.

ECF No. 22 at 4.

In summary, the Plan has satisfied each of its obligations under ERISA.  The Plan's

decision-making process was principled and well-reasoned.  The Plan did not abuse its

discretion when it denied Silva's claims for inpatient and residential treatment after March

18, 2015, because the Plan's decisions are supported by the substantial evidence in the

administrative record.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby grants judgment in favor of the

Plan. Because the Court has granted judgment to the Plan, Plaintiff's request for

attorney's fees and costs is hereby denied.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

May 19, 2020
Spartanburg, South Carolina